**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**


CHARLES L. KIETZ,             )

                                )        Civil Action No. 13 – 507

              Plaintiff,    )

                                )        District Judge David S. Cercone

          v.            )        Chief Magistrate Judge Lisa Pupo Lenihan

                                )

WASHINGTON COUNTY,       )

PENNSYLVANIA; WASHINGTON   )        ECF Nos. 7, 9

COUNTY PRISON BOARD;       )

CHERYL MCGAVITT; JANE DOE  )

#1; JANE DOE #2; JANE DOE #3;   )

JANE DOE #4; JANE DOE #5;     )

MATTHEW EISLEY, M.D.; JOHN  )

SIX, M.D.,                      )

                                )

               Defendants.


## REPORT AND RECOMMENDATION


### I.    RECOMMENDATION

For the reasons stated herein, it is respectfully recommended that the Motion to Dismiss that has been converted into a Motion for Summary Judgment be granted and that judgment be entered in favor of Defendants McGavitt, Washington County, and Washington County Prison Board. (Doc. No. 9.) It is further recommended that the remaining Defendants, Jane Does #1-#5 and Doctors Eisley and Six, be granted summary judgment *sua sponte* unless Plaintiff can show cause why the Court should not do so in his objections to this Report and Recommendation. If summary judgment is granted to Defendants Eisley and Six then their Motion to Dismiss (Doc. No. 7) should be denied as moot.

## II.    <u>REPORT</u>

Plaintiff Charles L. Kietz ("Plaintiff") is a state prisoner currently incarcerated at the State Correctional Institution at Forest. He initiated this action in the Court of Common Pleas of Washington County, Pennsylvania, by the filing of a Praecipe for Writ of Summons on December 8, 2012. (Doc. No. 1-2.) Because Plaintiff announced his intention to bring claims for violations of his federal constitutional rights, the action was later removed to this Court by Defendants Washington County, the Washington County Prison Board, and Cheryl McGavitt ("the County Defendants"), and its removal was with the express consent of Co-Defendants Doctors Matthew Eisley and John Six ("the Doctor Defendants").[1] (Doc. No. 1; Doc. No. 1-1; Doc. No. 1-4.)

Plaintiff's Complaint was filed on May 15, 2013, alleging that Defendants violated his Eighth and Fourteenth Amendment rights under the United States Constitution while he was detained at the Washington County Prison from October, 2010, until February, 2011. (Doc. No. 4.)

On July 15, 2013, the Doctor Defendants filed a Motion to Dismiss the Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) and the County Defendants filed a Motion to Dismiss in the form of a Motion for Summary Judgment. (Doc. Nos. 7, 9.) Because the County Defendants attached exhibits in support of their Motion, which this Court cannot consider when ruling on a motion to dismiss, Plaintiff was notified that the Motion would be converted into a Motion for Summary Judgment pursuant to Federal Rule of Civil Procedure 56,

---

[1]    All Defendants will be referred to herein as "the Defendants" and Dr. Eisley, Dr. Six and Cheryl McGavitt will be referred to as "the individual Defendants."

and he was given an opportunity to file a response in opposition to the Motion. (Doc. No. 14.) Plaintiff filed Responses to both Motions on September 30, 2013, attaching exhibits in support of both briefs in opposition. (Doc. Nos. 22, 25.) The Doctor Defendants elected to file a Reply in Opposition to Plaintiff's Response (Doc. No. 28), and Plaintiff then filed an Opposition to their Reply, (Doc. No. 29). The Motions are now ripe for review.

## A. Standard of Review

### 1. Summary Judgment

The County Defendants have filed a Motion to Dismiss that has been converted into a Motion for Summary Judgment.

Summary judgment is appropriate if, drawing all inferences in favor of the non-moving party, the record indicates that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment may be granted against a party who fails to adduce facts sufficient to establish the existence of any element to that party's case and for which that party will bear the burden of proof at trial. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). The moving party bears the initial burden of identifying evidence or the lack thereof that demonstrates the absence of a genuine issue of material fact. National State Bank v. Federal Reserve Bank of New York, 979 F.2d 1579, 1582 (3d Cir. 1992). Once that burden has been met, the non-moving party must set forth "specific facts showing that there is a genuine issue for trial" or the factual record will be taken as presented by the moving party and judgment will be entered as a matter of law. Matsushita Elec. Ind. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). An issue is genuine only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). The inquiry, then, involves determining

"whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Brown v. Grabowski, 922 F.2d 1097, 1111 (3d Cir. 1990) (quoting Anderson, 477 U.S. at 251-52). If a court, having reviewed the evidence with this standard in mind, concludes that "the evidence is merely colorable . . . or is not significantly probative," then summary judgment may be granted. Anderson, 477 U.S. at 249-50. Finally, while any evidence used to support a motion for summary judgment must be admissible, it is not necessary for it to be in admissible form. *See* Fed. R. Civ. P. 56(c); Celotex, 477 U.S. at 324; J.F. Feeser, Inc., v. Serv-A-Portion, Inc., 909 F.2d 1524, 1542 (3d Cir. 1990).

2. Judgment *sua sponte*

The Doctor Defendants have filed a Motion to Dismiss. Although they have not specifically moved for summary judgment, authority exists which provides that a district court may grant summary judgment to a non-moving party.

The Supreme Court recognizes "that district courts . . . possess the power to enter summary judgment *sua sponte*, so long as the losing party was on notice that [he] had to come forward with all of [his] evidence." Celotex Corp. v. Catrett, 477 U.S. 317, 326 (1986); *see also* Gibson v. Mayor & Council of Wilmington, 355 F.3d 215, 222 (3d Cir. 2004); Chambers Dev. Co. v. Passaic Cnty. Utils. Auth., 62 F.3d 582, 584 n.5 (3d Cir. 1995). Before a district court grants summary judgment to a non-moving party it must first place the adversarial party on notice that the court is considering such *sua sponte* action. *See* Gibson, 355 F.3d at 222. The Third Circuit explained that "notice" means "that the targeted party 'had reason to believe the court might reach the issue and receive a fair opportunity to put its best foot forward.'" Id. at

4

223 (quoting <u>Leyva v. On the Beach, Inc.</u>, 171 F.3d 717, 720 (1st Cir. 1999) and <u>Jardines Bacata, Ltd. v. Diaq-Marquez</u>, 878 F.2d 1555, 1561 (1st Cir. 1989)) (quotations omitted).  Additionally,

> [w]here it appears clearly upon the record that all of the evidentiary materials that a party might submit in response to a motion for summary judgment are before the court, a sua sponte grant of summary judgment against that party may be appropriate if those materials show no material dispute of fact exists and that the other party is entitled to judgment as a matter of law.

<u>Id</u>. at 224 (quoting <u>Ramsey v. Coughlin</u>, 94 F.3d 71, 74 (2d Cir. 1996)).  Despite the general notice requirement to the nonmoving party, the Third Circuit has concluded that, notice to the adversarial party is not required in three circumstances: (1) when there exists a fully developed record; (2) when the adversarial party would not be prejudiced by a *sua sponte* grant of summary judgment; and (3) when the decision is based on a purely legal issue.  <u>Id</u>.[2]

Although a district court's *sua sponte* grant of summary judgment must be undertaken with the utmost caution given the serious consequences to the adversarial party, in this instance such action is appropriate.  The exhibits submitted by the County Defendants, specifically Plaintiff's medical records, clearly show that the Doctors are entitled to judgment as well.  The Doctor Defendants did file a Motion to Dismiss, to which Plaintiff has responded. The undersigned believes that submission of Plaintiff's medical records put Plaintiff on fair notice that the Court would consider summary judgment in favor of the Doctors.  Moreover, Plaintiff himself submitted exhibits in opposition to the Doctor Defendants' Motion to Dismiss. Therefore it appears that all evidence Plaintiff could potentially proffer in support of his claims is in the record presently before the Court.

---

[2]    The court in <u>Gibson</u> found all three circumstances present in upholding the district court's *sua sponte* grant of summary judgment.  <u>Gibson</u>, 355 F.3d at 224.  The court declined to address whether the presence of some, but not all three circumstances would be sufficient to except the court from the notice requirement.  <u>Id</u>.; *see also* <u>DL Resources, Inc. v. FirstEnergy Solutions Corp.</u>, 506 F.3d 209, 224 n.14 (3d Cir. 2007) (against declining to address the question).

Nevertheless, by entry of this Report and Recommendation, Plaintiff is provided with notice that the undersigned is recommending that the Court *sua sponte* grant the Doctors summary judgment. In his response to this recommendation, he may show cause why the Court should not do so. *See* Beaton v. Lindsey, No. 9:09-3176-CMC-BM, 2010 U.S. Dist. LEXIS 118002, 2010 WL 4622512 (D.S.C. Nov. 5, 2010) (Report and Recommendation provided notice and opportunity to respond to the recommendation that summary judgment be granted to the non-moving party). He should further show cause why this Court should not grant summary judgment to Defendants Jane Does #1-#5, despite the fact that these Defendants have not yet been identified.

**B. Background**

The following is a summary of the allegations included in Plaintiff's Complaint and the documents of record before this Court.

Plaintiff claims to suffer from Chronic Obstructive Pulmonary Disease ("COPD"), Type 2 Diabetes, Mixed Hyperlipidemia, Hypothyroidism, Hypokalemia, Hypoalbuminemia, Proteinuria, Peripheral Neuropathy, Essential Hypertension, Recurrent Folliculitis and Nephrolithiasis. (Doc. No. 4 at ¶ 8.) He was brought to the Washington County Correctional Facility ("WCCF") on October 19, 2010. (Ex. A, Doc No. 13-1 at ¶ 9.)[3] He was evaluated by a Licensed Professional Nurse ("LPN") who refused commitment on the basis of his acutely

---

[3]    The County Defendants' Exhibits in support of their Amended Concise Statement of Undisputed Material Facts are docketed at Doc. No. 13. The Court will hereinafter cite to the Exhibits by their docket number.

    Exhibit A, Doc. No. 13-1, is the Affidavit of Defendant Cheryl McGavitt, Registered Nurse and Nursing Supervisor employed at the WCCF.

appearing medical condition. (Doc. No. 13-1 at ¶ 10; Doc. No. 13-2 at p.9.)[4] Plaintiff was short of breath with wheezing and he had edema of bilateral lower extremities. (Id. at ¶ 11; Id.) He was transported to the Washington County Hospital for evaluation and determination of whether he could be accepted for incarceration. (Id. at ¶ 12; Id.) He was attended to in the Emergency Room where he was diagnosed with bronchitis and cleared for incarceration by Dr. Frank Gaudio. (Id. at ¶ 13; Id. at pp.3-8.) He was given prescription for Levaquin, an antibiotic, a Combivent inhaler, and Prednisone, a steroid. (Id. at ¶ 14; Id. at p.1.) Following the hospital's clearance, Plaintiff was accepted into the WCCF and he was seen by an LPN when he arrived on October 20, 2010. (Id. at ¶¶ 15-16; Id. at p.20.) On that day, Dr. Six entered an order for fifteen medications, including Coumadin and other medications that Plaintiff had taken at home prior to commitment into the WCCF. (Id. at ¶ 17; Id.)

On October 23, 2010, Plaintiff was seen by an agency nurse for complaints about his foot. (Id. at ¶ 18; Id. at p.10.) He was then put on sick call and seen by the Physician's Assistant on October 25, 2010. (Id. at ¶¶ 18-19; Id.) At that time it was noted that Plaintiff was on Coumadin therapy for a medical history of deep venous thrombosis of the right leg in March 2010. (Id. at ¶ 20; Id.) On October 26, 2010, Dr. Six ordered Doxycycline, which was to be restarted after the Levaquin was stopped, which had been ordered by the Washington County Hospital Emergency Room. (Id. at ¶ 21; Id. at p.21.)

Two days later, Plaintiff had lab work (a PT and an INR) to evaluate the effectiveness of the Coumadin as well as his blood consistency. (Id. at ¶ 22; Id. at p.35.) Both his PT and INR levels registered at above the normal range. (Id. at ¶ 23; Id.) Dr. Six ordered the same dosage of

---

[4]        Exhibit B, Doc. No. 13-2, is composed of documents made up from Plaintiff's medical records, including his medical records from Washington Hospital.

Coumadin and directed that Plaintiff have lab work performed again in two weeks, which would have been November 11, 2010. (<u>Id</u>. at ¶ 24; <u>Id</u>.)

In the meantime, Plaintiff's prior primary care physician, Dr. DeRosa, was contacted by the WCCF and asked why she had placed Plaintiff on Coumadin and how long she had planned to continue him on the medication. (<u>Id</u>. at ¶ 25; <u>Id</u>. at pp.29, 35.) Nurse McGavitt states that she personally spoke to Dr. DeRosa who directed discontinuation of the Coumadin as Plaintiff was more than six months out from his pulmonary embolus and he no longer needed to take it. (<u>Id</u>. at ¶ 26; <u>Id</u>. at p.29.) Per the direction of Dr. DeRosa, Dr. Six entered an order discontinuing the Coumadin on November 2, 2011, and at that time he adjusted Plaintiff's insulin dosage. (<u>Id</u>. at ¶ 25; <u>Id</u>. at pp. 22, 29.)

On December 3, 2010, Plaintiff was seen by the Physician's Assistant for complaints of having a "hole in [his] stomach" for one week. (<u>Id</u>. at ¶ 30; <u>Id</u>. at p.11.) Plaintiff indicated a history of abdominal surgeries and the assessment at the time was an abdominal wound of uncertain etiology. (<u>Id</u>.; <u>Id</u>. at p.11.) Dr. Eisley referred Plaintiff to Dr. Angott, a general surgeon, for evaluation of the abdominal wound. (<u>Id</u>. at ¶ 31; <u>Id</u>. at pp.11, 42.)

Plaintiff met with Dr. Angott at his office on December 7, 2010. (<u>Id</u>. at ¶ 32; <u>Id</u>. at p.42.) Dr. Angott assessed Plaintiff with an open abdominal wound and ordered daily Iodoform packing, an "abd binder" and to cover the wound with gauze. (<u>Id</u>.; <u>Id</u>.)

On December 27, 2010, Plaintiff was seen by the Physician's Assistant for complaints of a wound on his third toe, right foot. (<u>Id</u>. at ¶ 33; <u>Id</u>. at p.12.) Plaintiff noted improvement in his toe because he had been cleaning and applying dressing to it for several days. (<u>Id</u>.; <u>Id</u>.) However, he noted no improvement to his stomach wound. (<u>Id</u>.; <u>Id</u>.) Dr. Eisley referred Plaintiff to Dr. Angott for a follow-up visit. (<u>Id</u>. at ¶ 35; <u>Id</u>. pp. 12, 43) That appointment was

scheduled for January 4, 2011. (<u>Id</u>.; <u>Id</u>. at p. 43.) During that follow-up visit, Dr. Angott noted that the wound had no granulation and was not draining. (<u>Id</u>. at ¶ 36; Id.) His assessment was a chronic abdominal wound, which was difficult to heal due to a large hernia. (<u>Id</u>.; <u>Id</u>.) Plaintiff was referred to the Wound Care Center. (<u>Id</u>.; <u>Id</u>.)

Plaintiff was transported to the Wound Care Center at the Washington Hospital on January 19, 2011. (<u>Id</u>. at ¶ 37; <u>Id</u>. at p.44) The physician at the Center ordered wound dressings, which included Promogran and Aquacel and also DuoDerm, with daily dressing changes. (<u>Id</u>. at ¶ 38; <u>Id</u>.) The physician also ordered that Plaintiff have an arterial and venous Dopplers and diabetic shoes. (<u>Id</u>.; <u>Id</u>.) The discharge instructions instructed that the tests be scheduled ASAP, but "definitely before next MD visit." (<u>Id</u>.; <u>Id</u>. at p.44.)

On January 20, 2011, Plaintiff presented to medical with complaints of pain in his right leg. (<u>Id</u>. at ¶ 39; <u>Id</u>. at pp.13-14.) Although it was noted that Plaintiff's abdominal wound showed no signs of infection, it was noted that his leg was very swollen. (<u>Id</u>.; <u>Id</u>.) The staff noted they would monitor the pain and swelling. (<u>Id</u>.; <u>Id</u>.) Also on this day, Plaintiff's appointment for venous and arterial Dopplers was scheduled for January 26, 2011. (<u>Id</u>. at ¶ 40; <u>Id</u>. at p.14.)

On January 21, 2011, Plaintiff was seen by the nursing staff at which time he denied any complaints of pain or distress. (<u>Id</u>. at ¶ 41; <u>Id</u>.)

On January 22, 2011, Plaintiff was seen for an abdominal wound dressing change and noted "minimal pain" in the right lower extremity. (<u>Id</u>. at ¶ 42; <u>Id</u>. at p.14.) He explained that his right leg was "achy" and rated his pain a 2 on a scale of 10. (<u>Id</u>.; <u>Id</u>.) It was noted that there was still swelling and Plaintiff was instructed to notify the staff if his pain or swelling increased or if he developed redness. (<u>Id</u>.; <u>Id</u>.) Plaintiff was later moved to the clinic cell for closer

observation where he was seen by nursing staff and denied any pain or discomfort.  (<u>Id</u>. at ¶¶ 43-44; <u>Id</u>.)  The following day, he once again denied pain to his right lower extremity.  (<u>Id</u>. at ¶ 45; <u>Id</u>.)

Plaintiff was seen by the Physician's Assistant on January 24, 2011.  (<u>Id</u>. at ¶ 46; <u>Id</u>. at p.15.)  He reported that he had right lower extremity swelling for four days but that the leg was not painful, only swollen.  (<u>Id</u>.; <u>Id</u>.)  Plaintiff was scheduled for a venous and arterial Doppler for January 26, 2011, but the PA was going to attempt to schedule the tests sooner.  (<u>Id</u>.; <u>Id</u>.)  Nurse McGavitt was then able to arrange to have the tests performed that day.  (<u>Id</u>. at ¶ 47; <u>Id</u>.)

Plaintiff was transferred to the Washington Hospital to obtain the venous Doppler and Nurse McGavitt was advised that the test was positive for a DVP, Deep Vein Thrombosis, of the right lower extremity.  (<u>Id</u>. at ¶ 48; <u>Id</u>. at pp.15, 27, 41.)  In response, Dr. Eisley ordered Lovenox and Coumadin to be started that day.  (<u>Id</u>. at ¶¶ 49-50; <u>Id</u>. at p.23.)  He examined Plaintiff the following day, January 25, 2011, and discussed the risks and the signs and the symptoms of a pulmonary embolism.  (<u>Id</u>. at ¶¶ 51-52; <u>Id</u>. at pp.16, 23.)  He also discussed the risks of lifelong Coumadin therapy.  (<u>Id</u>. at ¶ 52; <u>Id</u>.)  Dr. Eisley discontinued the order for the arterial Doppler and ordered an INR to be drawn the following day.  (<u>Id</u>.; <u>Id</u>.)  Plaintiff's INR results reported as 1.2 (normal .8-1.2), and in response Dr. Eisley ordered to continue the Lovenox and the Coumadin and to have lab work again on January 31, 2011.  (<u>Id</u>. at ¶¶ 53-54; <u>Id</u>.at pp.23, 37.)

On January 28, 2011, Plaintiff presented with complaints of having a nose bleed in the shower.  (<u>Id</u>. at ¶ 55; <u>Id</u>. at p.17.)  Upon examination, he was not bleeding and he made no further reports of bleeding that day.  (<u>Id</u>. at ¶ 56; <u>Id</u>.)

The next day, January 29, 2011, at 5:00 a.m., Plaintiff complained of right leg pain and inability to sleep.  (<u>Id</u>. at ¶ 57; <u>Id</u>.)  He was examined by a nurse and advised to try repositioning

his leg.  (Id.; Id.)  Later that day, he complained of right ankle pain.  (Id.; Id.)  Upon examination, it was noted that he had swelling and his legs were warm to touch.  (Id.; Id.)  He denied pain from the right knee to just above the outer ankle.  (Id.; Id.)  He also denied chest pain or shortness of breath.  (Id.; Id.)  He was provided with a pillow and instructed to elevate his right leg, and he was given Motrin for the pain.  (Id. at ¶¶ 58-59; Id.)  He was also instructed to notify the staff if his pain worsened or he had shortness of breath.  (Id. at ¶ 58; Id.)  Dr. Eisley was notified of Plaintiff's complaints.  (Id. at ¶ 57; Id.)

Plaintiff reported that the pillow helped immensely and that his leg was nowhere near as sore as it was previously.  (Id. at ¶ 59; Id.)  He also reported that the Motrin had alleviated his pain to a 4 on a scale of 10.  (Id.; Id.)  The following day, January 30, 2011, the nurse noted that Plaintiff was up and about in his room with no complaints of pain or discomfort.  (Id. at ¶ 60; Id.)

Per Dr. Eisley's order, Plaintiff had lab work done on January 31, 2011.  (Id. at ¶ 61; Id. at p.36.)  His INR was reported as elevated at 5.8 and Dr. Eisley was notified of the lab results.  (Id. at ¶¶ 61-62; Id. at p. 36.)  In response, Dr. Eisley decided to hold the Coumadin on January 31, 2011, and February 1, 2011, and to recheck Plaintiff's INR on February 2, 2011.  (Id.; Id. at pp. 24, 36.)  He also discontinued the Lovenox.  (Id.; Id.)

On February 1, 2011, Plaintiff was seen by a RN at 6:15 a.m., who noted that Plaintiff complained of minimal pain (2 on a scale of 10) in the right lower extremity.  (Id. at ¶ 63; Id. at pp. 17-18.)  He refused Ibuprofen and was instructed to elevate his right leg.  (Id.; Id.)  He was told he was going to be seen by the doctor later that day.  (Id.; Id.)  When Plaintiff was examined by Dr. Six, he reported complaints of pain and swelling of the right lower extremity.  (Id. at ¶ 64; Id. at p.18.)  He complained of two days of increased shortness of breath and now dizziness.  (Id.; Id.)  He also complained of pleuritic chest pain.  (Id.; Id.)  Dr. Six noted that Plaintiff had

swelling of the right lower extremity and pain with palpation. (<u>Id</u>. at ¶ 65; <u>Id</u>.) His blood pressure was low and his heart rate was elevated. (<u>Id</u>.; <u>Id</u>.) The impression at that time included recurrent right lower extremity DVT; increased shortness of breath, dizziness, hypotension, tachycardia; increased INR; and hypothyroidism. (<u>Id</u>. at ¶ 66; <u>Id</u>.) Dr. Six ordered Plaintiff to be transferred to the Emergency Room to rule out a pulmonary embolism, subconjunctival hemorrhage. (<u>Id</u>. at ¶ 67; <u>Id</u>. at pp.18, 24.)

Plaintiff was transported to the Washington Hospital Emergency Room. (<u>Id</u>. at ¶ 68.) After admission to the hospital, numerous tests were performed, including, but not limited to x-rays, venous Doppler study, an echo with color flow Doppler, an ultrasound of the kidneys, bilateral arterial Dopplers of the leg, and a CT angiogram of the abdomen, pelvis and bilateral lower extremities. (<u>Id</u>. at ¶ 69; <u>Id</u>. at pp.32-34.) He was found to have an acute thrombosis of the distal aorta and iliac arteries. (<u>Id</u>. at ¶ 70; <u>Id</u>.) On February 2, 2011, Dr. James Pareso, M.D., attempted a bilaterally femoral and iliac artery embolectomy and performed a left axillary to bilaterally femoral bypass. (<u>Id</u>. at ¶ 71; <u>Id</u>.) The postoperative diagnosis was chronic occlusion of distal aorta and iliac arteries, deep vein thrombosis and pulmonary embolus. (<u>Id</u>.; <u>Id</u>.)

Plaintiff was treated at the hospital until he was ready for discharge on February 11, 2011. (<u>Id</u>. at ¶ 72; <u>Id</u>.) He was discharged and returned to the WCCF with the medications that were ordered. (<u>Id</u>.; <u>Id</u>.) Plaintiff was transported from the WCCF to a State Correctional Facility on February 18, 2011, to begin his sentence. (<u>Id</u>. at ¶ 73.)

## C. Discussion

Plaintiff alleges that all Defendants were deliberately indifferent to his serious medical needs in violation of his Eighth and Fourteenth Amendment rights under the United States Constitution. In support of this claim, he alleges that the individual Defendants intentionally

deprived him of "proper, prompt, and/or otherwise adequate treatment," and that the individual

Defendant's actions were the result of a Washington County policy, custom or practice, thus

making Defendants Washington County and the Washington County Prison Board liable as well.

It is unclear whether Plaintiff was a pretrial detainee or a sentenced inmate during the

time of the events at issue in this case.  Different standards derived from different amendments to

the Constitution apply to convicted or sentenced individuals (Eighth Amendment) as to those

who are arrested but not yet convicted or sentenced (Fourteenth Amendment).  The Third Circuit

Court of Appeals has noted the confused state of the law on these varying standards.  *See*, *e.g.*,

Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2005).  However, it is clearly established that

claims of inadequate medical care by pretrial detainees are "evaluate[d] . . . under the Due

Process clause of the Fourteenth Amendment, which prohibits the defendants from undertaking

acts that amount to punishment."[5]  Thrower v. Alvies, 425 F. App'x 102, 104 (3d Cir. 2011)

(citing Hubbard v. Taylor, 399 F.3d 150, 166 (3d Cir. 2004)).  The Third Circuit has also stated

that the "Due Process Clause provides pretrial detainees with at least as much protection as is

afforded to prisoners raising denial-of-medical-treatment claims under the Eighth Amendment."

Id. at 105 (citing Natale v. Camden Cnty. Corr. Facility, 318 F.3d 575, 581-82 (3d Cir. 2003)).

Thus, courts apply the Eighth Amendment standard to determine whether a pre-trial detainee's

rights were violated.  *See* Lenhart v. Pennsylvania, No. 13-1173, 2013 U.S. App. LEXIS 11723,

2013 WL 2479409 (3d Cir. June 11, 2013) ("[A] pretrial detainee is not entitled to Eighth

Amendment protections, but nevertheless a pretrial detainee's claim of inadequate medical care

---

[5]       The Fourteenth Amendment, guarantees incarcerated persons humane conditions of confinement.  In this regard, prison officials must ensure that inmates receive adequate food, clothing, shelter and medical care, and must "take reasonable measures to guarantee the safety of the inmates."  Farmer v. Brennan, 511 U.S. 825, 832 (1994) (quoting Hudson v. Palmer, 468 U.S. 517, 526-27 (1984)).

is evaluated under the same standard as a convicted prisoner's Eighth Amendment claim of inadequate medical care[.]") (citing Natale, 318 F.3d at 581).

The record seems to suggest that Plaintiff was pretrial detainee during the time he was confined at the WCCF. While the undersigned will address his claims under the Fourteenth Amendment, applying the standard for claims under the Eighth Amendment, it is worth noting that whatever the proper standard applicable to Plaintiff, Plaintiff's Complaint alleges, at most, only negligence and negligent conduct is insufficient to state a claim under the Constitution. *See* Estelle v. Gamble, 429 U.S. 97, 106 (1978) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.")

In order to state a claim under the standard announced in Estelle, a plaintiff must demonstrate two elements: (1) he was suffering from a "serious medical need," and (2) prison officials were deliberately indifferent to the serious medical need. Estelle, 429 U.S. 97 (1978). The first showing requires the court to objectively determine whether the medical need was "sufficiently serious." A medical need is "serious" if it is one that has been diagnosed by a physician as mandating treatment, or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention. Monmouth County Correctional Institutional Inmates v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987), *cert. denied*, 486 U.S. 1006 (1988). The second prong requires the court to subjectively determine whether the officials acted with a sufficiently culpable state of mind. Deliberate indifference may be manifested by an intentional refusal to provide care, delayed medical treatment for non-medical reasons, a denial of

prescribed medical treatment, or a denial of reasonable requests for treatment that results in suffering or risk of injury. Durmer v. O'Carroll, 991 F.2d 64, 68 (3d Cir. 1993).

a. Defendants McGavitt, Dr. Eisley, Dr. Six, John/Jane Doe #1-5

Plaintiff alleges that the individual Defendants willfully and intentionally deprived him of proper medical care. He complains that Defendants: (1) returned him to the WCCF on January 19, 2011, even after Dr. Angott noted that he displayed signs of DVP and ordered immediate venous and arterial Doppler scans; (2) waited five days to perform the testing that Dr. Angott's ordered despite Dr. Angott's instructions that the testing be performed "immediately"; (3) did not follow Washington Hospital's instructions, on January 24, 2011, that Plaintiff be admitted into the hospital to start immediate treatment, or provide him with the ordered treatment, which included Lovenox, Coumadin, and a Heparin intravenous drip; (4) provided him with a combination of Lovenox injections, Coumadin and large dosages of Motrin for pain knowing that the administration of those medications in combination was likely to cause hemorrhaging; (5) discontinued his Coumadin medication on January 31, 2011, which caused recurrent DVT in his right lower extremity and resulted in his emergency admittance into Washington Hospital for life-saving treatment; and (6) did not refer him to a specialist or other outside medical professional for diagnosis and treatment. However, Plaintiff's medical records reveal a different story and suggest that he has misrepresented the care that he did receive while in custody at the WCCF.

Plaintiff first takes issue with the fact that he was returned to the WCCF on January 19, 2011, after Dr. Angott ordered arterial and venous Doppler scans to be performed "immediately." However, Plaintiff's discharge instructions do not support his allegation. Instead, they provide that the tests should be scheduled "ASAP" and "definitely before next MD

visit." On January 21, 2011, and consistent with the hospital's instructions, appointments were scheduled for Plaintiff to have the Doppler scans done at Washington Hospital on January 26, 2011. After Plaintiff experienced medical complications on January 24, 2011, Nurse McGavitt arranged to have the appointment rescheduled and performed that day.

Plaintiff complains that he should not have been discharged and returned to the WCCF on January 19, 2011. However, the decision to discharge Plaintiff is not attributed to any of the individual Defendants. Once Plaintiff was back at the WCCF, medical staff acted in accordance with the hospital's discharge instructions. They immediately scheduled an appointment for Doppler scans and even rescheduled the appointment for an earlier date once Plaintiff reported constant swelling of his right lower extremity on January 24, 2011.

Plaintiff seems to take issue with the fact that the scans were not performed until five days after his discharge, but there is nothing in the record to support his allegation that the scans needed to be performed "immediately." Instead, it was recommended that they be performed as soon as possible. His disagreement as to when the scans were performed does not state a claim for deliberate indifference.

Plaintiff next alleges that Defendants did not follow Washington Hospital's instructions to admit him into the hospital or to start him on Lovenox and Coumadin or provide him with a Heparin intravenous drip "immediately" following his Doppler scan on January 24, 2011, which was positive for DVT. Plaintiff is again mistaken. His medical records show that medical staff received a phone call from the hospital's radiology department on January 24, 2011, advising them of the results of Plaintiff's scan, and Dr. Eisley was immediately notified of the results. According to the medical records, the hospital ordered Plaintiff's discharge only if the WCCF was able to start him on Lovenox and Coumadin that day. Dr. Eisley ordered the medication and

Nurse McGavitt was able to arrange for delivery of the medication, which was re-started the same day as the diagnosis and order. Again, the Defendants acted in accordance with the hospital's instructions and the decision to discharge him is not attributable to the Defendants.

Plaintiff takes issue with the fact that he was not provided with a Heparin intravenous drip. However, the record does not support his allegation that the hospital ordered or recommended the drip, only Lovenox and Coumadin, which were provided.

Next, Plaintiff alleges that Defendants provided him with Lovenox, Coumadin and large dosages of Motrin knowing that the administration of those medications in combination was likely to cause hemorrhaging. Again, Plaintiff's allegation is not supported by the record, which demonstrates that the physicians at the WCCF provided him with the medications that were recommended by Washington Hospital. Dr. Eisley discussed the risks of lifelong Coumadin therapy with Plaintiff on January 25, 2011, and also discussed the signs and symptoms of a pulmonary embolism. Plaintiff was closely monitored and Dr. Eisley ordered lab work to be performed on January 26, 2011, and January 31, 2011. On January 26, 2011, Plaintiff's INR reported within the normal range, but on January 31, 2011, it reported elevated. In response, Dr. Eisley ordered to hold the Coumadin and discontinued the Lovenox. His plan was to recheck Plaintiff's INR on February 2, 2011, but Plaintiff was transported to the Washington Hospital Emergency Room before that could occur.

Plaintiff alleges that the discontinuation of his Coumadin medication on January 31, 2011, was the cause of his recurrent DVT and trip to the emergency room. Even assuming this is true, the record reveals that Dr. Eisley held Coumadin treatment in response to Plaintiff's elevated INR and he planned to recheck Plaintiff's INR in two days. This is not the culpable state of mind necessary to find deliberate indifference.

Finally, Plaintiff alleges that Defendants did not refer him to a specialist or outside medical provider for diagnosis and treatment. Notwithstanding the fact that Plaintiff *was* sent to outside medical providers on multiple occasions, as a basic premise, a prisoner has no independent constitutional right to medical care outside of prison. Roberts v. Spalding, 783 F.2d 867, 870 (9th Cir. 1986), *cert. denied*, 479 U.S. 930 (1986).

In the undersigned's view, it does not even appear that Plaintiff disagrees with the course of his medical treatment, allegations which clearly do not state a claim. *See* White v. Napoleon, 897 F.2d 103, 110 (3d Cir. 1990) ("[M]ere disagreements over medical judgment do not state Eighth Amendment claims.") (internal quotations and citations omitted)). Instead, it seems that Plaintiff just conclusively places blame on the Defendants and seeks to hold them liable for his medical emergency that occurred on February 1, 2011. However, despite Plaintiff's empty and bare bone assertions, there is nothing to suggest that the Defendants knew of a substantial risk to his health or safety and responded unreasonably to that risk. Evidence of unsuccessful medical treatment is insufficient to establish deliberate indifference. There is nothing in the record to suggest that the Defendants did not at all times use their best medical judgment. *See* Brown v. Borough of Chambersburg, 903 F.2d 274, 278 (3d Cir. 1990) ("[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights."). They provided Plaintiff with constant medical attention and even followed the course of treatment recommended by Washington Hospital. Plaintiff was provided various types of medications and his condition was closely monitored. There was no delay in treatment once Plaintiff presented with his medical issues and he was seen by outside medical providers on multiple occasions. Plaintiff's allegations, at most, show only negligence. *See* Estelle, *supra*. The Court will not second guess the propriety or the adequacy of the course of treatment with

which Plaintiff was provided even if it was unsuccessful.  Therefore, summary judgment should be granted to all individual Defendants.

b.  <u>Defendants Washington County and Washington County Prison Board</u>

Under section 1983, a local government like Washington County[6] is subject to liability "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury" complained of by the plaintiff.  <u>Monell v. Dept. of Soc. Servs. of City of New York</u>, 426 U.S. 658, 694 (1978).  The "official policy" requirement distinguishes acts of the municipality from acts of employees of the municipality, thereby limiting liability to action for which the municipality is actually responsible.  <u>Id</u>.

In finding municipal liability pursuant to § 1983, the plaintiff must identify the policy, custom or practice of the municipal defendant that results in the constitutional violation.  <u>Id</u>. at 690-91.  A municipal policy is made when a decision-maker "issues an official proclamation, policy, or edict."  <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990).  A custom or practice, however, may consist of conduct so permanent and well-settled that it has the force of law.  <u>Id</u>.

Finally, the plaintiff must show that, "through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged.  That is, a plaintiff must show that the municipal action was taken with the requisite degree of culpability and must demonstrate a direct causal link between the municipal action and the deprivation of rights."  <u>Bd. of County Comm'rs of Bryan County v. Brown</u>, 520 U.S. 397, 404 (1997).  For determining whether a municipality should be held liable under § 1983, "deliberate indifference" is the relevant standard.  This is a

---

[6] The undersigned assumes that the Washington County Prison Board is a subset of Washington County.

stringent standard of fault, requiring proof "that the municipal action was taken with deliberate indifference to its known or obvious consequence." Id. at 407 (internal quotations omitted); *see also* City of Canton v. Harris, 489 U.S. 378, 389 (1989). In other words, a plaintiff must demonstrate that a municipality had notice that a constitutional violation could occur and acted with deliberate indifference to this risk. Berg v. County of Allegheny, 219 F.3d 261, 276 (3d Cir. 2000).

First, Plaintiff alleges that Washington County had a custom, policy or practice in place to deny inmates medical care in order to reduce costs. In support of this allegation, he submitted the affidavit of Noreen Acheson, an apparent friend, who avers that she spoke to Deputy Warden Brian R. Hammet who told her that the WCCF was not equipped to handle Plaintiff's needs and that it had limited financial resources and needed to save wherever it could.[7] However, the record does not show that Plaintiff was denied any treatment based on costs, or denied any treatment whatsoever. In fact, Plaintiff was provided with the very same treatment that was recommended by outside physicians.

Plaintiff's allegation that Washington County had a policy, custom or practice to deny inmates access to medical care based on costs is entirely conclusive and even the affidavit of his friend Noreen Acheson does not suggest that such a policy exists. According to Acheson, Deputy Hammet informed here that the WCCF had limited financial resources but that he would see what he could do to help Plaintiff's situation. Plaintiff misconstrues Deputy Hammet's statement to mean that inmates are denied medical care because of limited financial resources. His statement does not support such an allegation. Moreover, Plaintiff has not specified exactly what medical care it was that he was allegedly denied based on consideration of costs in treating

---

[7] Doc. No. 24-5.

his medical conditions. Furthermore, such general statements regarding the allocation of health care expenses, simply do not, without more, establish a policy or practice of placing expense considerations over considerations of appropriate medical care. *See* <u>Ozoroski v. Maue</u>, No. 1:08-CV-0082, 2011 U.S. Dist. LEXIS 34588, at *19 (M.D. Pa. Mar. 31, 2011). Nonetheless, given that cost is a factor in treatment of non-incarcerated individuals, the fact that WCCF allegedly has a policy, which takes into account costs in its management of health care services to incarcerated persons, simply does not, without more, evince the requisite deliberate indifference. *See* <u>Glatts v. Lockett</u>, No. 09-29, 2011 U.S. Dist. LEXIS 19379, at *22-23 (W.D. Pa. Feb. 28, 2011).

Additionally, the Third Circuit recently held in <u>Winslow v. Prison Health Services</u>, 406 F. App'x 671 (3d Cir. 2011), a non-precedential opinion, that the naked assertion that a defendant considered or operated based on an effort to contain costs does not set forth an adequate factual basis to support a claim predicated on deliberate indifference. <u>Id</u>. at 674. In <u>Winslow</u>, the prisoner alleged that he had been diagnosed with a hernia and that the decision to treat his hernia with a belt instead of with surgery was improperly motivated by non-medical factors, principally cost. <u>Id</u>. at 672-73, 675. The plaintiff alleged that he was harmed by the prison's medical provider's "policies to save money[.]" <u>Id</u>. at 674. The Third Circuit held as follows:

> For one thing, the complaint's allegation that Winslow was harmed by "policies to save money" is exceedingly conclusory; the complaint does not provide any indication either of (1) what the relevant policies are, (2) what basis he has for thinking that "policies to save money" affected his medical treatment, or (3) what specific treatment he was denied as a result of these policies. More fundamentally, the naked assertion that Defendants considered cost in treating Winslow's hernia does not suffice to state a claim for deliberate indifference, as prisoners do not have a constitutional right to limitless medical care, free of cost constraints under which law-abiding citizens receive treatment. *See* <u>Reynolds v.</u>

> *Wagner*, 128 F.3d 166, 175 (3d Cir. 1997) ("[T]he deliberate indifference
> standard of Estelle does not guarantee prisoners the right to be entirely free from
> the cost considerations that figure in the medical-care decisions made by most
> non-prisoners in our society."); *Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th
> Cir. 2006) ("The cost of treatment alternatives is a factor in determining what
> constitutes adequate, minimum-level medical care, but medical personnel cannot
> simply resort to an easier course of treatment that they know is ineffective."
> (citations omitted)); *Caines v. Hendricks*, No. 05-1701, 2007 U.S. Dist. LEXIS
> 9453, 2007 WL 496876 at *8 (D. N.J. Feb. 9, 2007) ("[I]t is not a constitutional
> violation for prison authorities to consider the cost implications of various
> procedures, which inevitably may result in various tests or procedures being
> deferred unless absolutely necessary.").

*Winslow*, 406 F. App'x at 674-75.

See also *Reynolds v. Wagner*, 128 F.3d 166, 275 (3d Cir. 1997). "Resources are not infinite and reasonable allocation of those resources, taking into account cost, does not amount to deliberate indifference even if a prisoner does not receive the most costly treatments or his treatments of choice." *Brightwell v. Lehman*, No. Civ.A. 03-205J, 2006 WL 931702, at *8 (W.D. Pa. April 10, 2006). In this regard, the Court notes that the Eighth Amendment does not require a prison to provide an inmate "with the most sophisticated care money can buy." *United States v. DeCologero*, 821 F.2d 39, 42 (1st Cir. 1987). Nor are prison medical officers required to be blind to assessing the risks and costs of various treatment options. Furthermore, it is also clear that a dispute regarding whether doctors erred in this cost-benefit assessment, which is the essence of the medical art, sounds in negligence only and may not be cast as a constitutional violation. Thus, it is well-settled that an allegation of "mere malpractice of medicine in prison does not amount to an Eighth Amendment violation. This principle may cover . . . [an allegedly] erroneous calculus of risks and costs . . . ." *Harrison v. Barkley*, 219 F.3d 132, 139 (2d Cir. 2000).

Plaintiff also alleges that the actions of the individual Defendants were the product of a Washington County policy, custom or practice to delay or deny inmates access to medical care and access to qualified and specialized medical personnel. He further alleges the existence of a County policy, custom or practice in, *inter alia*, failing to conduct adequate examinations, perform warranted tests, carry out medical orders, provide prescribed medications, act on outside provider medical recommendations, provide proper facilities for inmate medical treatment, properly discipline employees, take adequate precautions in the hiring and retention of employees, and establish the functioning of a meaningful system of dealing with inmate mistreatment and employee misconduct.

As the County Defendants point out, it appears that Plaintiff has essentially pled a claim for vicarious liability, which is not cognizable under § 1983. *See* <u>Natale v. Camden County Corr. Facility</u>, 318 F.3d 575, 584 (3d Cir. 2003) (because *respondeat superior* or vicarious liability cannot be a basis for liability under 42 U.S.C. § 1983, a corporation under contract with the state cannot be held liable for the acts of its employees and agents under those theories). Nonetheless, Plaintiff's allegations regarding the existence of these policies are purely conclusive. There is no factual support in the Complaint for the proposition that the County's conduct was deliberate, in that they knew that a violation would occur and acted with deliberate indifference to that risk. Accordingly, the undersigned recommends summary judgment in favor of the County Defendants.

III.   <u>CONCLUSION</u>

For the aforementioned reasons, it is respectfully recommended that the Motion to Dismiss converted into a Motion for Summary Judgment be granted and that judgment be entered in favor of Defendants McGavitt, Washington County, and Washington County Prison

Board.  (Doc. No. 9.)  It is further recommended that the remaining Defendants, Jane Does #1-#5 and Doctors Eisley and Six, be granted summary judgment *sua sponte* unless Plaintiff can show cause why the Court should not do so in his objections to this Report and Recommendation.  If summary judgment is granted to Defendant Doctors Eisley and Six then their Motion to Dismiss (Doc. No. 7) should be denied as moot.

In accordance with the applicable provisions of the Magistrate Judges Act, 28 U.S.C. § 636(b)(1)(B)&(C), and Rule 72.D.2 of the Local Rules of Court, the parties shall have fourteen (14) days from the date of the service of this report and recommendation to file written objections thereto.  Any party opposing such objections shall have fourteen (14) days from the date on which the objections are served to file its response.  A party's failure to file timely objections will constitute a waiver of that party's appellate rights.

Dated:  February 19, 2014.

Lisa Pupo Lenihan
Chief United States Magistrate Judge

cc:  Charles L. Kietz
     JX-3122
     SCI Forest
     1 Woodland Drive
     PO Box 945
     Marienville, PA  16239
     *Via First Class Mail*

     Counsel of Record
     *Via ECF Electronic Mail*